Case number 23-1273, KARS 4 KIDS. Is it Mr. Cariello? Mr. Cariello, yes. Please, when you're ready. May it please the court, Chris Cariello for the appellant in CrossApp Elite KARS 4 KIDS. I'd like to reserve five minutes for rebuttal. Granted. On every issue that remains in this case, latches, unclean hands, and millions of dollars in KARS 4 KIDS profits, AMERICA CAN bears the burden. And the deficiencies in its showing are stark, and they are beyond reasonable dispute. First, AMERICA CAN provides no evidence of diligence for an eight-year period. It got calls from donors looking for KARS 4 KIDS, and it made no inquiries. As KARS 4 KIDS advertised on the internet, billboards, and the radio, it received thousands of Texas donations. Second, AMERICA CAN failed to establish that KARS 4 KIDS acted with intent to deceive donors. KARS 4 KIDS promoted its own name. Aggressively, sure. But it never tried to free ride off of someone else's, and certainly not AMERICA CAN's. And third, AMERICA CAN shows no diversion of donations. KARS 4 KIDS succeeded in Texas for the same reason it succeeded in all the other 49 states, by promoting its own mission, its own name, and receiving donations accordingly. AMERICA CAN had every opportunity to carry its burdens, and it failed. So did the district court misunderstand or misapply the burden here? Yes, Your Honor, absolutely the district court misapplied the burden here. I would start by looking at JA 45. The district court at JA 45 is describing the burden in this case, and says, the Third Circuit instructed me to impose a burden on AMERICA CAN. So I'll look at AMERICA CAN's papers first, essentially. That is all the district court understood the burden to mean. So a burden of production? Barely a burden of production, Your Honor. Honestly, it is more a point the finger back at KARS 4 KIDS in question where KARS 4 KIDS' proof of evidence in Texas is. If you review cases like Santana, Your Honor, University of Pittsburgh, both refer to the burden as a burden of proof. The prior panel opinion refers to it as a burden of proof. And that's especially true in a presumption case like this one where there's been a delay vastly beyond the analogous statute of limitations. It's very important for that burden to drive the analysis in a case like this, as it does in a case like Santana, because latches in this context is the only thing promoting the sorts of values that a statute of limitations would in the context where you have a statute of limitations. So it's really serving this critical gap-filling function. So AmericaCAN's position, as I understand it, is all that national advertising that you all did, it didn't reach Texas donors. How would they be able to prove a negative, you know, that your advertising didn't reach Texas people? Sure, Your Honor. So I want to take a step back and situate it within the applicable latches framework. So AmericaCAN's burden is to prove a reasonable justification for taking 10 years. So first, what's its justification? And second, is it reasonable? AmericaCAN's excuse is essentially a due diligence defense. So it's saying, we were diligent, we made inquiries, we had our radar on, we were checking. I want to return to that because there is no evidence that's actually true. But then it's arguing, even if we did that, or we did all of those things and we wouldn't have found anything in Texas. If AmericaCAN now has the difficult task of proving that, for example, 600 million impressions of keyword advertising didn't reach Texas, AmericaCAN has itself to blame for that because it took 10 years to do anything. Now, I take Your Honor's point. Had AmericaCAN actually been diligent all this time, actually made the inquiries? That's what a due diligence defense looks like, right? That's, we checked, we analyzed everything, and we didn't find anything. That's what a diligent party does. But you can't say, no, we never checked at all, but hey, had we checked, I'm sure we wouldn't have found anything. And that inherently is the problem with its argument, its complaint, that it has to prove a negative here. That's a problem of its own making. Now, I do want to return briefly to this diligence issue because I do think it's extremely significant here, and it's significant for two reasons. In trademark law, there is an independent duty to police the marketplace, to make sure that your source identifier that you've chosen is doing its source identifying job. Is the duty to police the marketplace equally applicable to a common law first use claim as it would be to a registered mark? I think it would be, Your Honor. I think the duty to police the marketplace. No, you would argue there's no distinction. So I don't want to suggest it's a monolith. I think it varies based on the circumstances. So what about here? Oh, here, the duty is at its apex. America Can sent a cease and desist letter, Your Honor. America Can saw one print ad. It said, this is infringement. It sent a cease and desist letter, and it drew its line in the sand. Beyond that, America Can was presented with red flags. Cheryl Poldergash, the director of marketing in America Can, JA 1198 testifies, she received telephone calls looking for cars for kids. Did Ms. Poldergash ask the donor, are you located in Texas? Did Ms. Poldergash ask the donor, where did you see cars for kids with a K, having sent a cease and desist letter? As far as this record discloses, not at all. Indeed, Your Honor, the only thing in this entire record that America Can points to as purportedly demonstrating some measure of diligence is 12 pages of transcript. It's JA, sorry, Your Honors, JA 1921, 1928 to 1941. And that's Malcolm Wentworth's testimony. And that is everything that they point to is these 12 pages right here about diligence. And I'd urge Your Honors to review it because Mr. Wentworth is not testifying to a single thing that America Can did to make reasonable inquiries to Google, for example, cars for kids, for any keyword advertising. All right. Let me ask you- Can I just ask one question on that? You know, I know you make a big argument about 75 million spent over 10 years divided by 10, seven and a half million. Seven and a half million dollars nationwide is not a very penetrable advertising buy. Your Honor, so $75 million- We're talking about the big state of Texas. Understood, Your Honor. So let me point to 10,000 donations between 2008 and 2013. That's JA 1879. If anything establishes goodwill built up among Texas donors, it's that 10,000 donations because advertising is obviously very important. Our expenditures in advertising building up a nationwide advertising program, critical. And I don't want to minimize that. But the proof is in the pudding. The proof is the fact that donors have donated to Cars for Kids. 10,000 from Texas? 10,000 from 2008 to 2013 alone, and that's a JA 1879. So that demonstrates that reservoir of goodwill in Texas that's built up over that period. Does laches apply equally to the forward-looking injunction as to the, you know, disgorgement, which is basically backward-looking here? Do the, you know, unclean hands factor analysis differ as to the two? Or would it, you know, is a Solomonic compromise to be maybe the disgorgement's not okay, but we can analyze the injunction separately? Your Honor, not in this case. In this case, the University of Pittsburgh admonition that where both components of laches are established, all relief should be foreclosed applies here. The reason I think it's equitable to do that here, in addition to University of Pittsburgh Santana governing those questions, is because America Can is engaged in precisely what laches doesn't want parties to engage in. It's sat on its hands for 10 years, and ultimately there is now goodwill. Those 10,000 donations mean something. Those are donors that have had good experiences, that have had good service. Cars for Kids has made it easy for them to donate their car. That goodwill exists now, and an injunction would inequitably deprive Cars for Kids of that goodwill, and effectively transfer it. There are- We're only talking about Texas. That injunction only applies in Texas. Yes, Your Honor, that's correct. That's correct, Your Honor. Now- You're saying that the University of Pittsburgh case supports your argument that laches should apply equally to the injunctive relief? Yes, Your Honor. So University of Pittsburgh and the Santana case both treat satisfying both elements of laches as foreclosing all equitable relief. America Can doesn't argue here for saving one or the other, for saving injunctive relief, doesn't ask for the Solomonic Compromise that Judge Bevis is suggesting, and it wouldn't make sense in a case like this. There are some instances- Isn't that sort of counterproductive to some of the testimony in the record that your executive even acknowledged that, yeah, we may be encroaching on their mark in Texas, but that encroachment may not be complete to our benefit. Your Honor, I think you're referring to the email involving from Asher Moskovitz. Mr. Moskovitz is not suggesting encroachment on their mark in Texas. He is acknowledging the possibility of confusion, and then immediately saying confusion would not be good for us in the long run. There is a doctrine, Your Honor. Pinkett is the place to look. If America Can wanted to make this argument, it's from Pinkett. It's called the Inevitable Confusion Doctrine. There are some contexts where despite laches, you might say, okay, because consumers are so certain to be harmed here, we still need to have injunctive relief. America Can hasn't made that argument. It doesn't make sense here, because while there is some confusion, there is no evidence of harm to the public, because there's no evidence of diversion. We've had a protocol in place for years. Injunction or not, we'll still have a protocol in place that will ensure that we don't take donations from Texas. So the Pitt case says that the most common situation is where the plaintiffs delay, will borrow its claim for damages, but not for prospective injunctive relief. That's the mind run of cases. They just sat on their rights. There is a narrow class of cases where their delay has been so outrageous, unreasonable, and inexcusable that they virtually abandoned their right. Is that, are you saying that this fits into that narrow? No, Your Honor. So University of Pittsburgh, that passage of University of Pittsburgh is referring to what is called delay alone. It's not referring to sort of full blown laches, which is both elements. So delay and prejudice. Delay and prejudice is what forecloses all equitable relief. And I'd like to reserve the rest of my time for rebuttal and I'll address any questions. May it please the court. My name is Aubrey Nick Pittman and along with my co-counsel, Karen Confoy and Christopher Kincaid, we represent America Can and America Can Cars for Kids. I wanna take a step back to remind the court how we got here. We got here when Cars for Kids filed an action where they were plaintiff. In that case, K4K had the burden to prove ownership, validity, and infringement. In other words, it was their burden, the district court, to prove that they were the first user, that they had open and continuous use of the mark. That was their burden. And in a minute, I'll go into why that's important. During the first appeal, K4K argued in front of the panel that they had national advertising. So that panel sent the case back to Judge Sheridan to analyze what K4K represented was national advertising. And Judge Porter, you had a question about the national advertising. The national advertising, when we went to back on remand, the judge gave us the burden, the proper burden. If you look at the record, it especially says, as America Can bears the burden to rebut the presumption of unreasonable delay, I consider each portion of K4K's advertising as presented by America Can. So America Can presented Judge Sheridan with hundreds of pages of evidence showing what K4K alleged to be their advertising. Were they alleged? The first time or second time? The first time or second time? Both times, Your Honor. Okay. Yes. And this was the same evidence that K4K introduced to prove their burden when they were plaintiffs. They had to convince the jury that they had first and continuous use of the mark. But after the remand, the burden of showing latches is on your client. K4K had a bunch of evidence. He doesn't mention any evidence that America Can disproved latches, so the district court got the burden of proof on that long on latches. No, I get it. Absolutely correct. Here's what happened. You delayed more than the six years in the analogous state statute of limitations. Correct. Right? So the burden is on you to disprove latches. Correct, absolutely. So where did the district court apply that and hold you to that burden? Well, the district court applied the presumption that there was, that latches applied, well, not that latches applied, because you've still got the unclean hands portion of it. Okay, we set aside unclean hands for now, but the presumption that latches applies, where did you introduce a bunch of evidence to rebut that? So the evidence is, you've got to explain away the delay. So the way the court looked at it, the way all the cases look at it, is you look at whether a reasonable owner would look at the marketplace, whether a reasonable owner would have reason to believe. Now, if you look at the- I mean, what kind of searching evidence, other things did your client do here that's in the record that the district court relied on? The district court didn't really hold you to much of a burden. No, absolutely. So what the district court relied on in terms of the information that we had, the district court first relied on the fact that we sent a 2003 desist letter. Now what that means is that we monitored the market to be able to send that. But you did nothing after the 2003 desist letter for decades and so that's not enough. The district court treats that as discharging your burden and then it treats Cars for Kids as blameworthy just because it received the letter. And that's, again, that's not enough to say you send a letter, therefore there's no laches. The laches is the delay after the letter. And for instance, the district court, the second time, said that K4K didn't provide no mailing list for 2003 postcards, no mailing list for National Mail Blast, lack of detailed analysis concerning Google, lack of evidence of distribution of 2003 print advertising, and so on and so forth. Sounds to me like the district court concluded what they did on the laches argument because they specifically said K4K didn't provide these items. And that's not what our original decision in this case directed the district court to do. Correct, so what the district court did is America Can presented the evidence. We presented several hundred pages of evidence of their advertising, what they call their national advertising. We presented that to the court. The court saw, let me give you for instance, the Google advertising. There was no Google ad. They keep suggesting that there was a Google ad. There was no Google ad. As a matter of fact, the district court saw that in 2005, there's $59 of Google invoicing from K4K. That's the information that we presented to the court. Now, what the court did is the court gave K4K the opportunity to rebut. Remember, it's a rebuttable presumption. There is a presumption of laches, but it's rebuttable. K4K has to rebut it? No, no, America Can rebutted it. America Can rebutted by showing the Google invoice with $59 in 2005. $59. $59 in 2005. There was another one in 2005 for $2,900. K4K's own expert admitted that he had no evidence of advertising in 2001, 2002, 2003. That's their expert. Again, we presented the district court with that information. Now, K4K's complaint now is that the district court didn't apply the burden because they presented evidence. Judge Porter was trying to ask you a question. That 2001, 2002, and 2003 is all before the cease and desist letter. And so before the laches sort of begins to accrue, right? The six-year laches period begins after you send the cease and desist letter? Correct. And so if you look at the activity, this is what the district court did after we presented him with the evidence. We presented the evidence for 2003 all the way to 2019. All of the information was presented to him. Did your evidence account for the 10,000 donations from Texas? How do you account for that? Well, the 10,000 donations happened years after the cease and desist letter. We're talking about 2008 to 2014. It's the same thing, Your Honor. You had a question about the $75 million. It's the same thing about the $75 million. All $75 million was spent after they received our cease and desist letter, after they ignored our cease and desist letter. It's fatal to K4K that they didn't respond to our cease and desist letter in 2000. How does that work against K4K on their latches argument? Well, the way it works against them is it would be a bad precedent for this court or any court to say to an infringer that it's in your best interest to ignore a cease and desist letter. Well, but if the person whose mark you're infringing isn't diligent and doesn't do anything, you're the one who's coming in asking for equitable relief. And the counterargument is you waited too long. Your Honor, the record shows if you look at the when K4K says we did nothing, if you look at those pages, those are 72 through 74 pages that they've cited. There's nothing there. There's nothing there except K4K's argument. Mr. Wentworth, who was the chief operating officer, he was there in 2005. He took the stand in the jury phase as well as the damages phase. He testified that there was nothing there. He started in 2005. He testified that they were searching. He testified that not only that, he went back and talked to all the employees who were there contemporaneously with this. And there was nothing there. And as evidence that there was nothing there, if you look at the information that we submitted to the district court, we submitted their ledger showing that there was no advertising in Texas. We submitted they had a 2005 People's Digest, one 2005 People's Digest. Mr. Pittman, when I asked your friend on the other side about the applicability of laches to the forward-looking judgment of relief, he argued forcefully that Pitt and Santana make clear that if laches applies, then all the equitable relief is foreclosed. Do you have any response to his reading of Pitt and Santana? Yes, sir. Your Honor, the quote you read from the UPenn case describes it exactly. It's got to be egregious. It would have to be egregious on behalf of America. Ted, but that was just about a case of delay with that portion of the quotation, and that when it comes to delay plus the kind of reliance that can cause harm that lead to laches, that that quotation didn't apply to that. That's untrue. And Your Honor, we could submit a supplemental brief showing that there are multiple cases all over the country that stand for the same proposition. Furthermore, K for K never briefed the issue of an injunction. They waived it. There's no, if K for K had briefed it in their briefing, then we would have had the opportunity to cite to the dozens of cases that. Your Honor, it would be, if you wanted to say that there's some special reason why our laches ruler shouldn't apply equally, it would seem like you don't seem to have really made that argument. Can I ask you about unclean hands? Yes. The entire basis of your unclean hands argument seems to be we sent the cease and desist letter. No, no, it's much more than that. If you look at the district court's opinion, and I'll cite to the. The district court basically just seems to have leaned on. They were willful in bad faith because they'd received the cease and desist letter. Well, it's more than that, Your Honor. Again, they looked at the activity of them forming a URL. They formed, their name starts with a K. They formed a URL, carsforkids.com, C-A-R-S, knowing that we were using carsforkids.org. You did the same thing. No, we didn't use it. You used a different one. We obtained that. And again, Your Honor, we're in different positions. OK, people register domain names with misspellings all the time. What else? You don't use it, and you don't direct it to your website. What else? And so the other thing is, again, in all the cases where you talk about assumption or risk for cease and desist letters, you have situations where the party who's claimed to be the infringer responds to the cease and desist letter. If you look at the cases that they've cited, the Groucho case, the Fitt case, all those cases are instances where someone actually responded to the cease and desist letter. You can't ignore a cease and desist letter. Why not? Some plaintiff's lawyer sends you something looking for a strike suit. You know, it's like, fine, go ahead. Prove it. Make it out. And then it doesn't back it up. So they're supposed to stop every time they get something if there's no progress. I mean, you've had a decade where you're doing nothing on this. So what makes that bad faith to say, like, well, they didn't have anything to back it up? It was just, it was nothing. Well, Your Honor, I can't accept K for K's argument that we did nothing. But as to the cease and desist letter, if you look at that, it's in the record 1585. The cease and desist letter is very specific. It says, if you stop, we'll leave this matter alone. And there's testimony from the COO and others that they saw no activity after that cease and desist letter. Now, if you actually believed, if K for K believed they had the right to continue, then they would have responded and said, wait a minute. We also have the right. So that's where you're planting your flag. No, no, Your Honor. The URL is the other thing. The other thing that we have is in 2012. That's when K for K said, we're going to go back into Texas. College for Kids with a C is well-branded in Texas. So we're going to go back into Texas. Again, so if you look at all of those things. You're blaming them for that. But in the meantime, your people are saying, hey, we're going to capitalize on this. And we're getting these donations that were meant for K for K. So it seems very, your analysis is very one-sided. Nothing your side did to capitalize matters. And everything their side did matters. No, Your Honor. The, we started in 2003 with a cease and desist letter. I got it. But unclean hands is like a balance. Like one side is much more blameworthy than the other. So if you two were doing comparable things, it can't be unclean hands. Mr. Pittman, let me ask you this. You argue on one hand that there wasn't anything out there that your people should have discovered over that 10 year period going on in Texas. Okay, that's essentially your argument against latches. But then at the same time, you're arguing that you're entitled to $10 million in disgorgement damages. How, if there was nothing going on, was any of their conduct that wasn't residual benefits from their other nationwide advertising, how does, you know, that lack of activity in Texas therefore require them to give you, your clients $10 million or $7 million or $4 million or any million dollars if they didn't do anything? Yes, so there is, the record is clear that there were surreptitious advertising, surreptitious use. K4K admitted that they were sending email directly to thousands of people in Texas. That's infringement. That would be, if I took a Nike logo and put it on shoes and sent out mailers to- You're implying that they did things to conceal that or hide that from you. Absolutely. Or they just did it. They just, well- They could have done it without any intent whatsoever. Did they add a PS, don't tell America Cam? I mean, what makes it surreptitious? Because you're doing it, you're not openly doing it. And your honors- How do you openly send an email? Well, you can openly advertise. Okay. Again, we had testimony from the chief operating officer who talked to, again, this is a small operation, so it's not like he had to talk to 50 people. He talked to three people who were around at the time. They all confirmed that during investigations, there was nothing about K4K in Texas. Again, we're talking about Texas. The other question, your honor, Judge Fisher, you had a question about whether it's an unregistered mark and the limitations. It's a little different. I mean, contrary to what my adversary said, it's a little different in the sense that when it's unregistered, you have more of a geographical, you have to show a different showing. Whereas if it's registered, then you have presumption of nationwide. So there is a difference. I appreciate it. So we're talking about what we're doing in Texas. And again, your honors. Let me go back to your email example. How does directing emails, how is that surreptitious behavior in Texas? You have an email address. You have my email address. You don't know where I am. I'm on a computer somewhere. I could be anywhere in the world. And you're gonna send me a communication to my email. There's no indication I'm in Texas. Well, their own testimony was that they got email addresses from the local people in Texas through their various, some of the regional publications that they had been doing, that they got that information. The Reader's Digest ads in the Jewish publications. Yes, your honor. And again, it started out being regional. But again, your honor, for the point of doing nothing, there was activity. So the question would be whether a reasonable trademark holder would have found anything. Were any of them Texas specific, like Texas monthly? I mean, Reader's Digest Jewish publications go nationally. I'm not sure how targeted these ads were back there. Were there any like Texas specific publications where the ads were just for Texas or specific to Texas? No, there were, one of their main publications, the Jewish Press, I believe, had nine subscribers in Texas. Okay, but if they put an ad in there, it's not just going to Texas. Well, we're looking at Texas. If we were looking at... But they placed the ad in the Jewish monthly. They're not telling them, put this in the nine magazines that go to Texas. They're paying for an ad that's going to all the subscribers. Correct. So the question would be whether a reasonable trademark holder in Texas would have recognized that in Texas and been able to bring a cause of action. All right. Thank you very much. Thank you. Thank you. Mr. Cariello. Thank you, your honors. A few points. I want to start with the advertising that was in Texas and the burden. I want to resist the impulse to pick every little thing apart and step back and give the full picture. There is internet advertising by keyword starting in 2003. There are red flags to America Can in the form of calls in 2006 and 2007. In 2008, there's radio spots. This is undisputed. JA 2101 to 03 and 2111. There are entries on the ledger of Cars for Kids advertising for Clear Channel Outdoor TX from 2123 to 35. Everyone acknowledges Clear Channel Outdoors billboards. And I would posit to your honors that TX means Texas unless the party with the burden demonstrates otherwise affirmatively. We talked about, your honors asked about Google advertising and my friend said $500. So I flipped two pages in the record on that ledger of advertising. One of them was JA 2094. Hundreds of thousands of dollars paid to Google for advertising. Then I flipped to JA 2120. Entry after entry of Google advertising. This is in 2008 and 2009. So it is simply not true that the numbers for Google advertising were as small as America Can or the district court has suggested. And then look at JA 82 if you want to see how the district court flipped the burden. What the court says there is neither party has provided expert testimony about market penetration regarding the internet advertising. Well, if there is a real burden in this case and it is on America Can, which party should bear the cost of neither party providing evidence of market penetration? JA what? 82. That's JA 82, your honor. Where the district court is reasoning that neither party has provided evidence of market penetration. That's what it looks like to flip the burden. And I also want to address, I started to address it in the opening, these pages from 1948 to 1940,  which my friend relied upon. There is absolutely nothing in that testimony that says that America Can did anything from 2003 until Mr. Wentworth started in 2011. Indeed, we objected twice at 1932 and 1940 and said, your honor, we don't understand. Is he testifying to what the organization did? Is he testifying to his own knowledge? Did he talk to anyone? What sort of monitoring activity would you expect to see in the record from a diligent Mark Holder? Sure, your honor. I'll give you two examples. One example, the director of marketing, when they received phone calls looking for Cars for Kids and had to set up a protocol to make sure those donations got to Cars for Kids, ask the question, are you in Texas? Where did you hear about Cars for Kids? Was it in Texas? That's one example. Another example, periodically Google it. In 2013, your honor, when America Can sends its second cease and desist letter, the example that it attaches as what violates its rights, keyword advertising. You can suss out keyword advertising, again, there's hundreds of thousands of dollars in payments to Google, merely by Googling it once a year. So what are we asking for? More than nothing, I think ultimately is what this court needs to decide in this case, whether that's required. Unclean hands, Judge Bibas, I think you're exactly right, ultimately, that it was sort of one-sided analysis here. But I do want to make clear that there is nothing on this record that satisfies the very high bar of establishing intentionally deceptive conduct. The question, the sort of necessary condition when it comes to unclean hands, is whether a party has behaved in a way that it doesn't think it has a right to behave. Cars for Kids, in this case, has always maintained, and the record reflects, it believed it had the rights to use its own mark, Cars for Kids with a K and a four, nationwide, in every state. It told the Patent and Trademark Office that, and the jury agreed that it was being truthful when it told the Patent and Trademark that. So the necessary condition for that highest level of culpability, the district court never found it, and indeed, when the equities are sort of split on both sides, the Polaroid, yes, sir? I'd like to ask you a question about the injunction. Is the injunction currently in place? It is, Your Honor. In Texas? It is, Your Honor. Okay, so the injunction's currently in place, and as I understand it, there's also a action that was stayed in the Patent and Trademark Office. Correct. On the fight between the registrations, right? So, all of that being the case, why shouldn't we just decide this case on the latches argument, as applies to this Gordman question, and just leave the injunction in place and let you continue to fight on this trademark issue before the office? Your Honor, because leaving the injunction in place would allow, would first of all allow America Can to prejudice us. We would still be within the jurisdiction of the court. We're facing these onerous injunctive relief requirements. Did you brief it? Does your brief cover the injunction question? Your brief in front of this court today? Our brief in front of this court does say what flows from establishing latches is that America Can is not entitled to any equitable relief. That includes both disgorgement and injunctive relief. I think you have a reference. The terms of the injunction cover, what, 30 different kinds of, there's a number of, the reports required to the court under this? There's onerous reporting requirements. There's geo-restriction requirements for our national advertising. It's very, very burdensome and it's very problematic to be subject to injunctive relief. Your Honor, if I just may just sum up with one or two sentences. This is a classic case of latches. America Can saw Cars for Kids advertising in 2003. It did nothing and Cars for Kids spent that time building up goodwill. That goodwill should be preserved. This is a classic story of latches and this court should give it that ending. Thank you very much, Mr. Cariello. We thank both sides for their helpful briefing and argument. We'll take the matter under advisement. We ask that the parties work together to have a transcript prepared. I'd ask that Mr. Cariello and Pittman meet us over at Sidebar. We'll go off the record and adjourn and thank both counsel for their help.